IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 1, 2021

## IN RE AAYDEN C. ET AL

**Appeal from the Juvenile Court for Sevier County**
**Nos. 19-001397, 19-001398          Dwight E. Stokes, Judge**

_____

**No. E2020-01221-COA-R3-PT**
_____

In this termination of parental rights action, the mother has appealed the juvenile court's final order terminating her parental rights to the minor children, Aayden C. and Patrick C. ("the Children"), based on three statutory grounds. On October 11, 2019, the Tennessee Department of Children's Services ("DCS") filed a petition seeking to terminate the mother's and the father's parental rights to the Children. Following a bench trial, the juvenile court found that statutory grounds existed to terminate the parental rights of both parents upon its determination by clear and convincing evidence that the mother and the father (1) had abandoned the Children by failing to provide a suitable home; (2) were in substantial noncompliance with the permanency plans; and (3) had failed to manifest an ability and willingness to personally assume custody of or financial responsibility for the Children. The juvenile court further found by clear and convincing evidence that it was in the Children's best interest to terminate the parental rights of both parents.[1] The mother has appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which W. NEAL MCBRAYER and KENNY W. ARMSTRONG, JJ., joined.

Gregory E. Bennett, Seymour, Tennessee, for the appellant, Sylvia A.-C.

Herbert H. Slatery, III, Attorney General and Reporter, and Kristen Kyle-Castelli, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

---

[1] Although the father was initially named as a party to this appeal, he did not file a notice of appeal or respond to mail sent by this Court. Accordingly, pursuant to this Court's January 28, 2021 order, the father was removed as a party to this appeal. We will therefore confine our analysis to the facts and issues relevant to the mother's appeal.

**OPINION**

## I. Factual and Procedural Background

This appeal arose from the order of the Sevier County Juvenile Court ("trial court") terminating the parental rights of the appellant, Sylvia A.-C. ("Mother"), and the father, Patrick C. ("Father"), to the Children. Mother and Father were never married. Aayden C. was born in January 2016, and Patrick C. was born in June 2017. Prior to the termination proceedings, DCS filed a petition for temporary legal custody of the Children on September 18, 2018, following a domestic altercation between Mother and Father at the residence they shared with the Children. The same day, the trial court entered a protective custody order, placing the Children in state custody and finding that DCS had made reasonable efforts to prevent the Children's removal from the parents' care. Mother and Father each respectively waived the right to a preliminary hearing.

Following an adjudicatory hearing, the trial court entered an order on November 28, 2018, adjudicating the Children dependent and neglected as to Mother and Father. Mother and Father each respectively stipulated that clear and convincing evidence existed that the Children were dependent and neglected based on the parents' substance abuse issues and the presence of domestic violence in the home. The trial court granted temporary care and custody of the Children to DCS and, as relevant on appeal, provided Mother with supervised visitation. The trial court also ratified a permanency plan, dated October 8, 2018, which Mother had participated in establishing.

The October 8, 2018 permanency plan provided, *inter alia*, that Mother would (1) visit the Children twice per month; (2) submit to random drug screens; and (3) submit to an alcohol and drug assessment, a domestic violence assessment, a mental health assessment, and a parenting assessment. The permanency plan further required Mother to provide proof of reliable transportation, stable housing, and an adequate legal source of income. The trial court ratified a second permanency plan on March 25, 2019,[2] and a third permanency plan on September 25, 2019.

On June 14, 2019, Mother pled guilty to a charge of public intoxication stemming from a March 30, 2019 incident occurring at a bar in Sevier County. In addition, according to testimony from Brenda Walthers, a DCS family service worker, Mother related to Ms. Walthers that she had been charged in the Sevier County General Sessions Court with aggravated assault on April 20, 2019, after officers with the City of Sevierville responded to an emergency call wherein Mother had allegedly stabbed Father in the leg. The related judgment, presented as an exhibit during the termination trial, indicates that the aggravated

---

[2] The March 25, 2019 permanency plan is not included in the record on appeal; however, the plan was admitted into evidence as expressly stated in the trial court's August 7, 2020 order.

assault charge was subsequently dismissed due to Father's failure to appear for the court proceedings.

On October 11, 2019, DCS filed a petition to terminate both parents' parental rights to the Children, specifically alleging the existence of the following statutory grounds as to Mother: (1) abandonment by an incarcerated parent; (2) abandonment through failure to provide a suitable home; (3) substantial noncompliance with the permanency plans; (4) failure to manifest an ability and willingness to personally assume custody of or financial responsibility of the Children; and (5) persistence of the conditions leading to the Children's removal from Mother's custody. DCS further alleged that termination of Mother's parental rights was in the best interest of the Children. DCS subsequently non-suited the ground of abandonment by an incarcerated parent as to Mother. On October 14, 2019, the trial court entered an order appointing a guardian *ad litem*, attorney Dianna Russell, for the Children.

The trial court set an initial hearing for January 8, 2020; however, DCS was unable to locate and serve Mother or Father with process prior to the hearing. As such, the trial court reset the initial hearing for April 1, 2020. DCS ultimately served process upon Father via publication notice. Following its determination of indigency, the trial court entered an order on February 28, 2020, appointing counsel to represent Mother during the termination proceedings. Due to court closures for non-emergency hearings because of the COVID-19 pandemic, the initial hearing was again reset.

The trial court subsequently conducted a bench trial on August 5, 2020. Present for the trial were counsel for DCS; attorney Jeff Stern, who was appearing for Ms. Russell as guardian *ad litem*; counsel for Mother; Ms. Walthers; and K.L., the foster father of the Children ("Foster Father"). Mother and Father did not personally appear at the trial notwithstanding their having received proper service of process and notice of the proceedings. Prior to the trial, Mother's counsel orally requested a continuance based on Mother's absence; however, the trial court denied Mother's counsel's request.

The trial court entered a written order on August 7, 2020, terminating Mother's and Father's parental rights to the Children. The court specifically found clear and convincing evidence of three statutory grounds as to Mother: (1) abandonment by failure to provide a suitable home, (2) substantial noncompliance with the permanency plans, and (3) failure to manifest an ability and willingness to personally assume custody of or financial responsibility for the Children. The trial court further determined that termination of Mother's parental rights was in the best interest of the Children and certified its order as a final judgment pursuant to Tennessee Rule of Civil Procedure 54.02.

Following entry of the final order, the trial court entered an order permitting Mother's trial counsel to withdraw and substituting appellate counsel. Mother timely appealed.

## II. Issues Presented

Mother has raised the following issues on appeal, which we have restated and reordered slightly as follows:

1.  Whether the trial court erred in determining by clear and convincing evidence that Mother abandoned the Children by failing to provide a suitable home.

2.  Whether the trial court erred in determining by clear and convincing evidence that Mother had failed to manifest an ability and willingness to personally assume legal and physical custody of or financial responsibility of the Children.

3.  Whether the trial court erred in determining by clear and convincing evidence that Mother was substantially noncompliant with the permanency plans.

4.  Whether the trial court erred by ostensibly finding that clear and convincing evidence existed to support termination of Mother's parental rights on the ground of persistence of the conditions leading to the Children's removal.

5.  Whether the trial court erred by finding clear and convincing evidence that termination of Mother's parental rights was in the Children's best interest.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

> * * *

> In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). In addition, as our Supreme Court has explained, this Court is required "to review thoroughly the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 525.

IV. Statutory Grounds for Termination of Mother's Parental Rights

Tennessee Code Annotated § 36-1-113 (Supp. 2020) lists the statutory requirements for termination of parental rights, providing in relevant part:

(a)     The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c)     Termination of parental or guardianship rights must be based upon:

(1)     A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)     That termination of the parent's or guardian's rights is in the best interests of the child.

In its final judgment, the trial court determined that the evidence clearly and convincingly supported a finding of three statutory grounds to terminate Mother's parental rights: (1) abandonment by failure to provide a suitable home, pursuant to Tennessee Code Annotated §§ 36-1-113(g)(1) and -102(1)(A)(ii); (2) failure to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the Children, pursuant to Tennessee Code Annotated § 36-1-113(g)(14); and (3) substantial noncompliance with the permanency plans pursuant to Tennessee Code Annotated §§ 36-1-113(g)(2) and 37-2-403(a)(2). We will address each statutory ground in turn.

- 6 -

## A. Abandonment by Failure to Provide a Suitable Home

Concerning statutory abandonment, Tennessee Code Annotated § 36-1-113(g)(1) (Supp. 2020) provides as relevant to this action:

> (g)     Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1)     Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

Regarding the definition of abandonment applicable to this ground, Tennessee Code Annotated § 36-1-102(1)(A)(ii) (Supp. 2020) provides:

> (a)     The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;
>
> (b)     The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
>
> (c)     For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

With regard to this statutory ground, the trial court specifically found:

This Court finds, by clear and convincing evidence, that the ground of Abandonment-Failure to Provide a Suitable Home, has been proven against both the mother and father.

The children were removed from the parents in September 2018 after a very serious incident involving domestic violence and substance abuse. Both parents were aware that their children were placed into DCS custody. Both parents were present at the Preliminary Hearing and waived their hearing. Both parents were present at the Adjudication in November 2018 and stipulated to dependency and neglect based on their substance abuse issues and domestic violence in the home.

The parents' participation in the case has been very erratic. Both have willfully failed to address the issues that led to their children going into DCS custody. They continued to fail drug screens and sometimes just did not show up for drug screen requests. The father's hair follicle test in February 2019 was positive for cocaine. The mother was arrested for Public Intoxication in March 2019.

DCS could not drug screen either parent for most of this past year because the parents could not be found. DCS'[s] last contact with the father was in August 2019. The mother had contact with DCS in August 2019 and then not again until February 2020. During that contact in February 2020, the mother reported she had recently been at a domestic violence shelter in Texas but they sent her home. FSW [Family services worker] Walthers reported the mother stated she had recently been hit head-on by a bus and that she was going to get a lot of money from it. FSW Walthers reported the mother sounded like she might be under the influence of alcohol or drugs based on how she was speaking. FSW Walthers asked the mother to go take a drug screen and the mother hung up on FSW Walthers. This was the last time the mother made contact with DCS.

Both parents have been resistant to addressing the domestic violence issues, typically blaming one another for the issues. The domestic violence has resulted in criminal charges against both parents at times. The mother was charged in April 2019 with Aggravated Assault with allegations that she stabbed the father in the leg. The charge was ultimately dismissed after the father failed to show up to the court date. The mother reported to FSW Walthers in May 2019 that she had recently lied about injuries she sustained,

- 8 -

telling a medical provider she had fallen off a cliff while hiking when in reality, the father had assaulted her.

The parents visited the children at the beginning of the case but then have not seen them since August 2019. The parents have abandoned these children and have shown no steadfast desire to address their issues or establish a suitable home. DCS made reasonable efforts in the first four months of this case by directing the parents to Helen Ross McNabb, where they could complete many of their permanency plan tasks and by setting up visitation between the parents and the children. The parents attended an orientation at Helen Ross McNabb during that time but did not follow through with the recommendations.

Although the parents ultimately completed parenting classes and the father obtained a domestic violence course certificate, the parents did not address their substance abuse issues or mental health issues. When they obtained further assessments that recommended therapy, neither complied with those recommendations. Nor did the parents ever provide proof of housing, a transportation plan, or a legal source of income. FSW Walthers testified that the father reported that he was frequently out of town for work, but that he would never provide proof of income, such as a letter from his employer or a tax statement. The mother reported to FSW Walthers in February 2019 that the father had recently spent $3,000 at a "crack house" in Knoxville where she was also present. The parents also bounced around from hotels and had an apartment for a short period of time in August 2019, but then they dropped out of the picture completely.

The parents have not appeared today to contradict any of the testimony presented today. It was not anyone else's responsibility but their own to show that they could obtain stability and maintain that stability. Neither parent even demonstrated a willingness to comply.

Based upon our review of the evidence presented in light of the statutory factors, we agree with the trial court.

Mother has not disputed that the Children were adjudicated dependent and neglected by the trial court on November 28, 2018. In fact, Mother stipulated to the dependency and neglect finding based on her substance abuse issues and the presence of domestic violence in the home. Mother also has not disputed that the Children's situation prevented DCS from making reasonable efforts to prevent removal.

Mother does dispute, however, whether DCS made reasonable efforts to assist her in establishing a suitable home during the four months following the Children's removal.

On appeal, DCS posits that its efforts to assist Mother were focused on Mother's ability to provide a home devoid of drugs and domestic violence. To this end, Ms. Walthers testified that during the four months following the Children's removal, DCS provided information to Mother regarding service providers to address Mother's domestic violence and substance abuse issues, including Helen Ross McNabb Center. Ms. Walthers further testified that Mother had confirmed to DCS that she had insurance. DCS focused its search for service providers upon those that would assist Mother financially. Although Ms. Walthers testified that Mother made an appointment with Helen Ross McNabb and attended an orientation, it is undisputed that Mother failed to follow up with her subsequent appointments.

Mother also never completed any domestic violence courses throughout the proceedings. Ms. Walthers explained that during these domestic violence courses, Mother would blame Father and claim that she was the victim. Ms. Walthers also related that Mother never believed she should have to "address the domestic violence." According to uncontroverted testimony from Ms. Walthers, Mother was arrested for domestic violence in December 2018 during the time she was refusing treatment for domestic violence issues. Following Mother's release from jail in February of 2019, Mother was again afforded the opportunity to seek treatment at Cease Women's Shelter. During the four months following the Children's removal, DCS confirmed with Cease Women's Shelter that it would assist Mother with her housing, transportation, and other services. However, Mother refused to follow up with Cease Women's Shelter and confirm her desire to participate in the program.

Concerning Mother's substance abuse issues, DCS arranged, during the four months following the Children's removal, for Mother to attend an intensive outpatient program orientation in November 2018. Upon Mother's completion of the orientation, program personnel referred Mother for an alcohol and drug treatment assessment, which Mother failed to complete. Ms. Walthers testified that shortly thereafter, Mother had indicated to Ms. Walthers that she had personally accompanied Father to a "known crack house in Knoxville" in January of 2019 where he had allegedly spent $3,000 on illicit drugs. Later, in March 2019, three days following Mother's having undergone an alcohol and drug assessment, Mother was arrested for public intoxication, as evinced by the sworn affidavit of complaint included in the record as an exhibit. From April 2019 to May 2019, Mother was again incarcerated by reason of a domestic violence incident involving Father. According to Ms. Walthers, when DCS attempted to contact Mother regarding a drug screen in July 2019, DCS was unable to ascertain Mother's whereabouts.

Through Ms. Walthers, DCS was unable to contact Mother until September 2019 when she consented to a drug screen, which revealed Mother's use of barbiturates. Following a subsequent negative drug screen in October 2019, DCS was unable to contact Mother until February 2020 when she claimed she had tested negative for several drug screens. However, Mother never provided proof of these alleged negative results. DCS's

final contact with Mother was via a telephone call in late February 2020, during which DCS requested a drug screen from Mother. Mother terminated the conversation.

Concerning Mother's housing situation, Ms. Walthers testified that when DCS obtained custody of the Children, Mother was residing in a motel with Father. Although Mother subsequently resided in a house, she indicated to Ms. Walthers that she had no intention of remaining at the home. Mother thereafter resided in various motels. As stated above, Mother also declined to arrange housing with Cease Women's Shelter after DCS had worked with Mother to secure availability at the shelter.

Ms. Walthers testified that in August 2019, Mother resided with Father in a house or apartment in Sevierville. Mother's service provider, Camelot Care Centers, conducted a visit to this residence and did not report any concerns. However, when DCS contacted Mother the following month, Mother claimed she was living in Kentucky but never provided an address for any residence in Kentucky. After DCS had not heard from Mother for several months in late 2019 and early 2020, Mother spontaneously contacted DCS and related she was living at a shelter in Austin, Texas, which DCS was able to confirm. However, upon DCS's follow-up telephone communication, personnel at the Texas shelter confirmed that Mother had been discharged.

As this Court has previously explained concerning the reasonable efforts analysis:

> Reasonable efforts is a fact intensive inquiry and must be examined on a case-by-case basis. *State v. Puryear*, 2005 WL 735038, *9 (Tenn. Ct. App. Mar. 30, 2005). "Reasonable efforts" as defined by the legislature is "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tennessee Code Annotated section 37-1-166(g)(1) (2003). However, the burden of family reunification does not lie entirely with DCS as reunification is a "two-way street." *State Dept. of Children's Services v. Belder*, 2004 WL 1553561, *9 (Tenn. Ct. App. July 9, 2004).

*In re C.L.M.*, No. M2005-00696-COA-R3-PT, 2005 WL 2051285, at *9 (Tenn. Ct. App. Aug. 25, 2005). We determine that the evidence preponderates in favor of a determination that DCS made reasonable efforts to assist Mother in establishing a suitable home in the four months following removal of the Children.

It is undisputed that DCS arranged to provide transportation and other services to Mother, including services through the Helen Ross McNabb Center and Cease Women's Shelter. Mother failed to follow up on information provided by DCS concerning housing opportunities and programs to assist with her substance abuse and domestic violence issues. Mother also failed to attend mental health and substance abuse treatment during the first four months the Children were in DCS custody, and she refused to initiate contact with

Cease Women's Shelter after DCS had arranged housing, transportation, and other services there for her. Mother failed to maintain contact with DCS regarding her whereabouts and at other times informed DCS that she had moved to Texas and Kentucky and was staying in various motels. The evidence demonstrated that Mother failed to stabilize her housing situation for nearly two years following the Children's removal into DCS custody.

As this Court has explained, "[t]o be considered reasonable, [DCS's] efforts need not be 'Herculean,' but they must be equal to or greater than those of the parent." *In re Brian W.*, No. M2020-00172-COA-R3-PT, 2020 WL 6390132, at *5 (Tenn. Ct. App. Oct. 30, 2020) (citing Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c); *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014)). We conclude that DCS's efforts in this case greatly exceeded Mother's efforts and were therefore reasonable. In addition, despite DCS's efforts, Mother had not "made reciprocal reasonable efforts to provide a suitable home and ha[d] demonstrated a lack of concern for the child[ren] to such a degree that it appears unlikely that [she] will be able to provide a suitable home for the child at an early date." *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c).

The evidence clearly and convincingly demonstrates that Mother was not able to establish a home to which the Children could safely return due to her domestic violence and substance abuse issues, as well as her inability to acquire stable housing. Although Mother attended an initial assessment for alcohol and drug treatment, Mother failed to follow up and attend subsequent treatments. Likewise, Mother failed to follow through with her domestic violence classes, instead solely blaming Father for the domestic violence problems within the household. Despite DCS's persistent efforts to discover Mother's whereabouts, DCS was unable to locate Mother for intermittent periods of time following the Children's removal to DCS custody. In sum, Mother never addressed the issues that led to the Children's initial removal into DCS custody. We therefore conclude that the trial court properly determined that clear and convincing evidence supported the statutory ground of abandonment by failure to provide a suitable home.

### B. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility of the Children

Mother asserts that Petitioners failed to present clear and convincing evidence to support termination of her parental rights pursuant to Tennessee Code Annotated § 36-1-113(g)(14), which provides as an additional ground for termination:

A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

- 12 -

Upon our careful review of the record, we determine that the trial court did not err in finding that clear and convincing evidence existed to support this statutory ground for termination of Mother's parental rights.

Our Supreme Court has recently explained the following with regard to this ground for termination of parental rights:

> Two prongs must be proven by clear and convincing evidence to terminate parental rights under this statute: (1) the parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child; and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

*In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

As to the first prong, our Supreme Court has held:

> [S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied.

*Id.* at 677 (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)). Concerning the "substantial harm" requirement of the second prong, this Court has observed:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted in Maya R.)).

- 13 -

Regarding the first prong in the instant action, the trial court found that DCS had proven by clear and convincing evidence that Mother had manifested neither the ability nor the willingness to personally assume legal and physical custody of the Children or financial responsibility for the Children. The court stated concerning this ground, specifically as related to Mother:

> The parents have not demonstrated a true willingness to change or shown any ability to rectify the domestic violence and substance abuse issues. While the parents were once participating in the case, they have been absent for almost one year at this point. The parents continued to test positive for drugs and never completed any recommended treatment. . . . When the mother was asked in February 2020 to complete a drug screen, she hung up on FSW Walthers and has never called again.

In addition, the trial court found the following concerning the parents' domestic violence issues and the effect on the Children:

> Rather than address the domestic violence in their relationship where they have both been the aggressor, the parents instead point fingers at one another. The mother has alleged to FSW Walthers that the father has physically abused her and the father has alleged to FSW Walthers that the mother has physically abused him.

> The children themselves struggled with physical aggression at the beginning of the case, harming each other, other children, and animals in the first foster home to the point that the first foster parent requested the children be removed from her home. [Foster Father] testified that when the children were placed in his home in August 2019, both children hit each other as well as him and his wife. [Foster Father] testified to how they would employ various techniques over time to help the children's aggression. [Foster Father] testified that the children's aggression resolved after a few months and that it is no longer an issue.

Based on its findings, the trial court concluded that placing the Children back into Mother's home at this point would "pose a risk of substantial harm to both the physical and psychological welfare of the children."

On appeal, Mother does not appear to contest the trial court's finding that she failed to manifest an ability and willingness to assume legal and physical custody of the Children. Instead, Mother contends that DCS did not satisfy its burden with regard to Mother's inability to manifest the ability and willingness to "assume financial responsibility" of the Children. Mother also contends that DCS failed to meet its burden of proving that placing

the Children in Mother's care would pose a risk of substantial harm to the physical or psychological welfare of the Children. We disagree.

The evidence demonstrates that Mother's participation throughout the proceedings was sparse. In February 2020, Mother ceased communication with DCS and ended her personal involvement in all court proceedings. Ms. Walthers also testified that Mother never provided DCS with proof of legal income. Instead, Mother appeared to rely on Father's income, but Father likewise provided no proof of income to DCS. Although Mother claimed at one point that she maintained employment at a convenience store, she never provided sufficient documentation to substantiate that employment. The evidence also demonstrated that Mother never satisfied her child support obligation with respect to the Children. Based on the foregoing, we agree with the trial court's determination that in addition to demonstrating clear and convincing evidence that Mother failed to manifest an ability and willingness to personally assume legal and physical custody of the Children—a finding that Mother does not appear to contest—DCS likewise satisfied its burden to demonstrate that Mother failed to manifest an ability and willingness to assume financial responsibility for the Children.

Concerning the second prong of the statutory ground, substantial harm, we determine Mother's argument to be unavailing. Mother ostensibly compares the instant action to *State of Tennessee, Dep't. of Children's Services v. T.M.B.K.*, 197 S.W.3d 282, 296 (Tenn. Ct. App. 2006), wherein "the record support[ed] only one incident of domestic violence which led to the removal of the children." We find *T.M.B.K.* to be factually distinguishable. In the present action, the evidence contains numerous instances of domestic violence, including Mother's stipulation in the dependency and neglect proceedings that the Children were dependent and neglected based on domestic violence within the household. Mother admitted to DCS that at least two instances of domestic violence had occurred, and the record demonstrates her continued refusal to attend courses to address domestic violence issues.

Furthermore, as the trial court found in its final order, "[t]he children themselves struggled with physical aggression at the beginning of the case, harming each other, other children, and animals in the first foster home to the point that the first foster parent requested the children be removed from her home." The record supports this finding. Ms. Walthers testified that when the Children entered DCS custody, the Children were "quite hyperactive," demonstrating "significant aggressive behaviors." She further related that one of the Children "had bloodied another child's nose and was hitting on the [first] foster parents' younger child." The Children's aggression subsequently led to the removal of the Children from their first foster placement. However, through therapy and the second foster family's efforts, as Ms. Walthers explained, the Children have since ceased exhibiting aggressive behavior. Meanwhile, Mother has not demonstrated a desire to address her issues of domestic violence. Based on the foregoing, we agree with the trial court's

determination that placing the Children into Mother's home would pose a risk of substantial harm to both the physical and psychological welfare of the Children.

Upon careful review of the record, we agree with the trial court's determination that returning the Children to Mother's custody would pose a risk of substantial harm to the Children's physical and psychological welfare. Accordingly, we affirm the trial court's determination by clear and convincing evidence regarding this statutory ground for termination of Mother's parental rights.

### C. Substantial Noncompliance with Permanency Plans

The trial court also found by clear and convincing evidence that Mother had failed to substantially comply with the statement of responsibilities set forth in the permanency plans. Tennessee Code Annotated § 36-1-113(g)(2) provides as an additional ground for termination of parental rights:

> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4[.]

The trial court stated the following findings of fact regarding this statutory ground, specifically as relevant to Mother:

> The Court finds by clear and convincing evidence that the ground of Substantial Noncompliance with the Permanency Plan has been proven against both the mother and the father. The Court finds that two permanency plans were admitted into evidence, dated October 8, 2018 and March 25, 2019. The Court finds that the steps in both of these plans were reasonable and related to the conditions necessitating foster care.
>
> The parents completed parenting classes and the father completed a domestic violence course. The parents were required to attend visitation with their children twice per month. Although they visited in the beginning of the case, visitation became sporadic in the spring of 2019 when the parents were asked to take drug screens prior to visitations. The parents last visited with the children in August 2019. The parents were also asked to take random drug screens as a requirement in the plans. Although the parents sporadically participated in drug screens in 2019, DCS has been unable to drug screen the parents since September 2019 because the parents have not maintained contact with DCS.
>
> The parents have not provided proof of housing, income, or a transportation plan. The mother has not addressed domestic violence. . . .

In March 2019, both parents completed combined mental health and alcohol and drug assessments but did not comply with the recommendations. The mother was recommended to begin family therapy and individual therapy and to participate in alcohol and drug education. She was advised that, if she used drugs or failed a drug screen, to participate in Intensive Outpatient Treatment, ("IOP"). However, the mother did not participate in any of these recommendations, despite being arrested for Public Intoxication three days after the assessment and failing a drug screen three months later. . . .

Although the parents completed a few tasks on the plan, they have not successfully addressed the issues which led to the children coming into custody: substance abuse and domestic violence.

Upon thorough review of the record, we determine that the evidence preponderates in favor of the trial court's findings.

To terminate parental rights pursuant to Tennessee Code Annotated § 36-1-113(g)(2), the parent's noncompliance with the permanency plan must be substantial. *See In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002). Additionally, our Supreme Court has held that "the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *Id.* This Court has explained the following regarding the ground of substantial noncompliance with the permanency plan:

> Mere noncompliance is not enough to terminate a parent's rights. *In re Valentine*, 79 S.W.3d [643,] 548 [(Tenn. Ct. App. 2004)]. Additionally, the unsatisfied requirement(s) must be important in the plan's scheme. *Id.* A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d [643,] 656 [(Tenn. Ct. App. 2004)] (citing *In re Valentine*, 79 S.W.3d at 548). Improvements in compliance are construed in favor of the parent. *In re Valentine*, 79 S.W.3d at 549 (citing *State Dept. of Human Servs. v. Defriece*, 937 S.W.2d 954, 961 (Tenn. Ct. App. 1996)). Yet, we must determine compliance in light of the permanency plan's important goals:
>
>> In our view, a permanency plan is not simply a list of tasks with boxes to be checked off before custody is automatically restored. Rather, it is an outline for doing the things that are necessary to achieve the goal of permanency in children's lives. We think that where return to parent is the goal, parents must complete their responsibilities in a manner that

> demonstrates that they are willing and able to resume caring for their children in the long-term, not on a month-to-month basis.

> *In re V.L.J.,* No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at *8 (Tenn. Ct. App. Dec. 30, 2014).

*In re Abbigail C.*, No. E2015-00964-COA-R3-PT, 2015 WL 6164956, at *20-21 (Tenn. Ct. App. Oct. 21, 2015).

In the instant action, the trial court removed the Children from Mother's custody on September 18, 2018. The court subsequently adjudicated the Children dependent and neglected on November 28, 2018, based in part on Mother's stipulation of dependency and neglect due to substance abuse and domestic violence. Concomitant with the trial court's dependency and neglect adjudication, the court ratified the first permanency plan with the anticipated completion date of April 8, 2019. This plan set forth, *inter alia*, the following responsibilities for Mother to complete: (1) visit the Children twice per month; (2) attend and submit to random drug screens; (3) submit to an alcohol and drug assessment, a domestic violence assessment, a mental health assessment, and a parenting assessment; (4) provide proof of reliable transportation, stable housing, and an adequate legal source of income; (5) provide releases so that DCS could communicate with Mother's health care providers; and (6) pay child support as to both Children. Mother participated in the first permanency plan's development and agreed to her responsibilities therein. Despite the development of two additional permanency plans during the time the Children were in custody, Mother's responsibilities remained substantially the same throughout the plans.[3]

Although Mother attended a parenting class and alcohol and drug assessment, Mother provided no proof of a mental health assessment or continued individual counseling. Mother also demonstrated an inability to submit to drug screens on a consistent basis, terminating communication with DCS following DCS's request for a drug screen in February 2020. Prior to ceasing contact with DCS, Mother also failed at least one drug screen in September 2019.

Furthermore, Mother has acknowledged on appeal that she had not completed a domestic violence course prior to trial. However, Mother asserts that such requirement

---

[3] We note that the trial court based its ruling in part on Mother's noncompliance with the first two permanency plans. Although the second permanency plan is not included in the appellate record, the trial court expressly stated in its final order that both permanency plans "were admitted into evidence." *Cf. In re Cloey R.*, No. E2014-00924-COA-R3-PT, 2015 WL 273685 (Tenn. Ct. App. Jan. 21, 2015) (reversing the trial court's finding that the father had failed to substantially comply with the permanency plan when the plan was not admitted into evidence.). Concerning the second permanency plan, Ms. Walthers's unrefuted testimony at trial was that it contained "essentially the same" steps as the first permanency plan with "more specific[]" steps concerning domestic violence.

was not reasonably related to the conditions that brought the Children into DCS custody despite the trial court's determination to the contrary in its final order. Specifically, Mother argues that the "only 'evidence' that this requirement was reasonably related to the conditions which brought the children into custody was an aggravated assault charge against the Mother that was ultimately dismissed during the preliminary stages." We disagree.

Our review of the record indicates that one of the primary bases for the trial court's adjudication of the Children as dependent and neglected was Mother's ongoing struggle with domestic violence issues to which she had stipulated during the dependency and neglect proceedings. In addition, Ms. Walthers testified that Mother had admitted to at least one instance of perpetrating domestic violence against Father in December 2018 when Mother attempted to retrieve a cellular telephone from Father. Another instance of domestic violence occurred when Mother sustained injuries that required her to seek treatment in an emergency room. Ms. Walthers related that although Mother had initially lied about the cause of her injuries, she later confirmed to Ms. Walthers that her injuries were sustained from an altercation with Father. Mother's argument in this regard is unavailing.

In addition, Mother ostensibly contends that her substance abuse issues were not reasonably related to the conditions that brought the Children into custody. Again, we disagree. In the dependency and neglect proceedings, Mother acknowledged her substance abuse problems (cocaine and alcohol), which, coupled with her stipulation to domestic violence concerns, formed the bases for the trial court's determination that the Children were dependent and neglected. After Mother attended an intensive outpatient program orientation at the Helen Ross McNabb Center, she failed to follow up with subsequent appointments and recommendations set forth by that provider.

Additionally, as previously noted, Ms. Walthers testified regarding Mother's statement that Mother had accompanied Father to a home where Father purportedly obtained illegal drugs. According to Ms. Walthers, when Mother attended an alcohol and drug assessment in March 2019, the provider determined that Mother was minimizing her substance abuse issues. Within days of completing this assessment, Mother was arrested for public intoxication. Mother then failed a drug screen in September 2019, testing positive for barbiturates. Although Mother correctly points out that she failed only one drug screen while passing another drug screen during the fall of 2019, we note that DCS was unable to test Mother for several months due to her incarceration from April to May of 2019, DCS's inability to locate Mother in July 2019, and Mother's unilateral decision to cease communication with DCS beginning in February 2020.

Regarding proof of income, Mother never produced documentation of an adequate source of legal income. Instead, Mother made unsupported assertions that she was

employed at a convenience store.  Mother also based her income on Father's income, which was never sufficiently proven.

Although Mother did participate in supervised visitation with the Children immediately following their removal from her home, she did not maintain regular visitation.  Beginning in February 2020, Mother essentially disappeared through the date of the trial and neither participated in nor requested any visitation with the Children.  Even before this episode, Mother was typically either unavailable to take or unable to pass drug screens, which was a prerequisite to her ability to visit with the Children as set forth in the permanency plans.  Thus, Mother never progressed sufficiently to enable her to enjoy unsupervised visitation with the Children, much less to permit the Children to be placed in her custody.

Mother also failed to remedy her inappropriate housing circumstances from the time the Children were taken into DCS custody.  Although Ms. Walthers testified that Mother had obtained suitable housing for a brief period of time in Sevierville, Tennessee, Mother subsequently vacated that residence, and DCS was unable to locate her.  During the time the Children remained in DCS custody, Mother had frequently lived in motels and temporary housing in various states, including Tennessee, Texas, and Kentucky.  Mother never demonstrated that she resided in safe, stable, and permanent housing.  In addition, Mother was unable to provide proof of reliable transportation in accordance with the requirements of the permanency plans.

Based on the evidence presented, we conclude that Mother failed to substantially comply with the goals and responsibilities of the permanency plans.  Mother did not establish a suitable home and did not demonstrate that she could appropriately parent the Children despite nearly two years of assistance from DCS.[4]  In short, Mother had failed to "complete [her] responsibilities in a manner that demonstrate[d] that [she was] willing and able to resume caring for [the Children] in the long-term." *See in re V.L.J.*, No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at *8 (Tenn. Ct. App. Dec. 30, 2014).  We therefore determine that clear and convincing evidence supported this ground for termination as well.

## D.  Persistence of Conditions

Mother raises an additional issue concerning the trial court's oral finding at trial that Mother's parental rights should be terminated based on persistence of the conditions leading to the Children's removal, as codified at Tennessee Code Annotated § 36-1-

---

[4] Mother contends that Tennessee Code Annotated § 37-1-166 required in this termination action that "DCS make reasonable efforts to assist in the reunification of the family."  We disagree.  As our Supreme Court has stated:  "Nothing in Section 37-1-166 . . . addresses proof on reasonable efforts in a *termination* proceeding." *In re Kaliyah S.*, 455 S.W.3d 533, 554 (Tenn. 2015).

113(g)(3)(A). During trial, the court made the following announcement concerning this statutory ground:

> Persistence of conditions, we can go on this same situation. Where [the parents] had the issues, none of those being addressed. The drug issues, showing a willingness, and an ability, and the desire to stay drug-free. To be available where they can take drug screens, and to be available for follow through with the steps they needed to.
>
> All these are absent and again, all of these have persisted to the point that [the parents] didn't ever indicate that they wanted to be able to show that they would be willing and able to have the children returned to them.

However, as Mother points out on appeal, the trial court's August 7, 2020 order is devoid of any written finding concerning this statutory ground.

As our Supreme Court has explained: "It is well-settled that a trial court speaks through its written orders—not through oral statements contained in the transcripts—and that the appellate court reviews the trial court's written orders." *Williams v. City of Burns*, 465 S.W.3d 96, 120 (Tenn. 2015) (quoting *Anil Constr. Inc. v. McCollum*, No. W2013-01447-COA-R3-CV, 2014 WL 3928726, at *8 (Tenn. Ct. App. Aug. 7, 2014)). Likewise, this Court has explained:

> The role of this Court is an error-correcting court, and our review is limited to the trial court's written findings and conclusions. This is especially true in light of Tennessee Code Annotated Section 36-1-113(k)'s requirement that trial courts enter written orders containing specific findings of fact and conclusions of law in termination cases.

*In re Navada N.*, 498 S.W.3d 579, 594 (Tenn. Ct. App. 2016).[5] Inasmuch as the trial court's August 7, 2020 order does not contain any written findings concerning the statutory ground of persistence of conditions, we conclude that this ground was not included in the final order as a basis for termination.

## V. Best Interest of the Children

Mother further argues that the trial court erred in finding by clear and convincing evidence that termination of her parental rights was in the best interest of the Children. We disagree. When a parent has been found to be unfit by establishment of at least one

---

[5] Tennessee Code Annotated § 36-1-113(k) (Supp. 2020) provides in relevant part: "The court shall enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing."

statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005); *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) (Supp. 2020) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

- 22 -

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As our Supreme Court has explained regarding the best interest analysis:

"The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." In re Angela E., 303 S.W.3d [240,] 254 [(Tenn. 2010)].

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

In re Gabriella D., 531 S.W.3d 662, 681-82 (Tenn. 2017).

In its final order, the trial court specifically considered each of the statutory factors, made respective findings, and concluded that the factors weighed against maintaining Mother's parental rights to the Children. Following our review of the evidence presented, we agree with the trial court's determination.

With regard to the first statutory factor, the trial court found that Mother had not made any type of adjustment to her circumstances, conduct, or conditions that would make it safe and in the Children's best interest to be in her home. Noting that Mother had failed a drug screen and had continued to engage in domestic violence with Father as evinced by her April 2019 incarceration, the trial court found that Mother had not addressed her substance abuse or domestic violence issues. Most notably, as the trial court emphasized, Mother effectively ceased participation in the proceedings involving the Children. As a result of its finding, the trial court determined that this factor favored termination of Mother's parental rights. In addition to the trial court's findings, we determine that Mother has also failed to demonstrate a stable and reliable housing situation that would be suitable for the Children.

Concerning the second factor, despite the many months of services provided by DCS, Mother had failed to effect a lasting change in circumstance. As the trial court determined, Mother failed to take advantage of visitation with the Children that had been

arranged by DCS, in part due to her failure to submit to drug screens or, in one instance, failure to pass a drug screen. DCS also directed Mother to service providers with whom she could have completed her assessments and recommendations. One such facility would have provided Mother with transportation if needed. DCS identified various providers for Mother that would have accepted the insurance that Mother purportedly had. However, Mother failed to contact these service providers. Although Mother completed one of her assessments and attended an orientation with the Helen Ross McNabb Center, she did not follow up with the treatment that the service providers recommended. The second statutory factor weighs in favor of terminating Mother's parental rights.

Factor three addresses whether Mother had maintained regular visitation with the Children, and we conclude that she had not. The trial court found, and we agree, that Mother had "completely taken [herself] out of the picture." As of the date of trial, Mother had not visited with the Children in over a year and had not contacted DCS concerning visitation with the Children. The trial court also found that Mother did not have a meaningful relationship with the Children, and the evidence supports this finding. As such, factors three and four militate in favor of termination.

Regarding factor five, the evidence demonstrates that removing the Children from their current placements and placing them in Mother's custody would have a detrimental effect on their emotional, mental, and physical well-being. The evidence supports the trial court's findings that although the Children were initially physically aggressive with their first foster family, they were doing well by the time of trial. Testimony demonstrated that the Children's communication skills had improved and that they had been able to develop in an emotionally secure home such that their violent episodes had ceased. As Ms. Walthers testified at trial, the Children recognized their current foster parents as their mother and father and did not inquire about Mother. We therefore determine that factor five supports termination of Mother's parental rights.

Little or no evidence was presented with regard to factor six, which involves whether Mother had shown "brutality, physical, sexual, emotional or psychological abuse, or neglect" toward the Children. However, the trial court found that factor seven favored terminating Mother's parental rights. Mother stipulated to substance abuse in the dependency and neglect proceedings. Mother has since failed to address her substance abuse issues, and Ms. Walthers's testimony indicated that Mother had in February 2019 accompanied Father to purchase illegal drugs at a "known crack house." Likewise, at the time of trial, Mother had not addressed the domestic violence in her life, which she had perpetrated at times. We determine that this factor weighs in favor of terminating Mother's parental rights.

Concerning the eighth factor, the trial court determined that Mother's mental and emotional status would be detrimental to the Children and would prevent Mother from providing safe and stable care and supervision for the Children. We agree. Again, the

evidence demonstrates that Mother failed to attend recommended mental health treatment. With regard to the final factor, the evidence indicates that Mother never paid child support as was required by the permanency plans. Therefore, we determine that the final two factors also militate in favor of terminating Mother's parental rights to the Children.

Based on our thorough review of the evidence in light of the statutory factors, we conclude that the evidence presented does not preponderate against the trial court's determination by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Children. Having also determined that statutory grounds for termination were established, we affirm the trial court's termination of Mother's parental rights to the Children.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's judgment in all respects, including the termination of Mother's parental rights to the Children. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Mother's parental rights and collection of costs assessed below. Costs on appeal are assessed to the appellant, Sylvia A.-C.

s/ Thomas R. Frierson, II
THOMAS R. FRIERSON, II, JUDGE